IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

HUNTINGTON DIVISION

JUDITH FAYE FISHER,

      Plaintiff,

v.                                     Case No.: 3:20-cv-00290

ANDREW M. SAUL,
Commissioner of the
Social Security Administration,

      Defendant.

## PROPOSED FINDINGS AND RECOMMENDATIONS

This action seeks a review of the decision of the Commissioner of the Social Security Administration (hereinafter "Commissioner") denying Plaintiff's applications for a period of disability and disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f. The matter is assigned to the Honorable Robert C. Chambers, United States District Judge, and was referred to the undersigned United States Magistrate Judge by standing order for submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending are Plaintiff's Brief in Support of Judgment on the Pleadings and the Commissioner's Brief in Support of Defendant's Decision, requesting judgment in his favor. (ECF Nos. 14, 19).

The undersigned has fully considered the evidence and the arguments of counsel. For the following reasons, the undersigned **RECOMMENDS** that Plaintiff's request for judgment on the pleadings be **DENIED**; the Commissioner's request for judgment on the

pleadings be **GRANTED**; the Commissioner's decision be **AFFIRMED**; and this case be **DISMISSED** and removed from the docket of the Court.

## I.    <u>Procedural History</u>

In May and July 2017, Judith Faye Fisher ("Claimant"), completed applications for DIB and SSI, respectively, alleging a disability onset date of August 22, 2015 due to "diabetes mellitus, diabetic neuropathy in feet, peripheral neuropathy in leg, L5-S1 bulge, arthritis, degenerative changes of cervical and lumbar spine, depression, OCD, panic disorder with agoraphobia anxiety, trichotillomania, high blood pressure, high cholesterol, hypothyroidism, Meniere's Disease, fibromyalgia, [and] vitamin D deficiency." (Tr. at 599-617, 644). The Social Security Administration ("SSA") denied Claimant's applications initially and upon reconsideration. (Tr. at 16). Claimant requested an administrative hearing, which was held on February 26, 2019 before the Honorable Neil Morholt, Administrative Law Judge ("the ALJ"). (Tr. at 39-74). On March 13, 2019, the ALJ issued a written decision, finding that Claimant was not disabled as defined by the Social Security Act. (Tr. at 13-38). The ALJ's decision became the final decision of the Commissioner on February 27, 2020 when the Appeals Council denied Claimant's request for review. (Tr. 1-7).

Claimant timely filed the present civil action seeking judicial review pursuant to 42 U.S.C. § 405(g). (ECF No. 2). The Commissioner subsequently filed an Answer opposing Claimant's complaint and a Transcript of the Administrative Proceedings. (ECF Nos. 11, 12). Claimant filed a Brief in Support of Judgment on the Pleadings, and the Commissioner filed a Brief in Support of Defendant's Decision. (ECF Nos. 14, 19). Consequently, the matter is fully briefed and ready for resolution.

## II.  **Claimant's Background**

Claimant was 51 years old on her alleged onset date and 54 years old on the date of
the ALJ's decision. (Tr. at 30). She communicates in English; has a high school education;
and previously worked as a janitor, cashier, and deli slicer. (Tr. at 69, 643, 645).

## III.  **Summary of ALJ's Decision**

Under 42 U.S.C. § 423(d)(5), a claimant seeking disability benefits has the burden
of proving a disability. *See Blalock v. Richardson,* 483 F.2d 773, 775 (4th Cir. 1972). A
disability is defined as the "inability to engage in any substantial gainful activity by reason
of any medically determinable impairment which has lasted or can be expected to last for
a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The Social Security regulations establish a five-step sequential evaluation process
for the adjudication of disability claims. If an individual is found "not disabled" at any
step of the process, further inquiry is unnecessary, and benefits are denied. 20 C.F.R. §§
404.1520(a)(4), 416.920(a)(4). The first step in the sequence is determining whether a
claimant is currently engaged in substantial gainful employment. *Id.* §§ 404.1520(b),
416.920(b). If the claimant is not, then the second step requires a determination of
whether the claimant suffers from a severe impairment. *Id.* §§ 404.1520(c), 416.920(c). A
severe impairment is one that "significantly limits [a claimant's] physical or mental ability
to do basic work activities." *Id.* If severe impairment is present, the third inquiry is
whether this impairment meets or equals any of the impairments listed in Appendix 1 to
Subpart P of the Administrative Regulations No. 4 (the "Listing"). *Id.* §§ 404.1520(d),
416.920(d). If so, then the claimant is found disabled and awarded benefits.

However, if the impairment does not meet or equal a listed impairment, the
adjudicator must assess the claimant's residual functional capacity ("RFC"), which is the

3

measure of the claimant's ability to engage in substantial gainful activity despite the limitations of his or her impairments. *Id.* §§ 404.1520(e), 416.920(e). After making this determination, the fourth step is to ascertain whether the claimant's impairments prevent the performance of past relevant work. *Id.* §§ 404.1520(f), 416.920(f). If the impairments do prevent the performance of past relevant work, then the claimant has established a *prima facie* case of disability, and the burden shifts to the Commissioner to demonstrate, in the fifth and final step of the process, that the claimant is able to perform other forms of substantial gainful activity, given the claimant's remaining physical and mental capacities, age, education, and prior work experiences. 20 C.F.R. §§ 404.1520(g), 416.920(g); *see also McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983). The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore v. Weinberger*, 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the SSA "must follow a special technique at each level in the administrative review process," including the review performed by the ALJ. 20 C.F.R. §§ 404.1520a(a), 416.920a(a). Under this technique, the ALJ first evaluates the claimant's pertinent signs, symptoms, and laboratory results to determine whether the claimant has a medically determinable mental impairment. *Id.* §§ 404.1520a(b), 416.920a(b). If an impairment exists, the ALJ documents his findings. Second, the ALJ rates and documents the degree of functional limitation resulting from the impairment according to criteria specified in 20 C.F.R. §§ 404.1520a(c), 416.920a(c). Third, after rating the degree of functional limitation from the claimant's impairment(s), the ALJ determines the severity of the limitation. *Id.* §§ 404.1520a(d), 416.920a(d). A

4

rating of "none" or "mild" in the four functional areas of understanding, remembering, or applying information; (2) interacting with others; (3) maintaining concentration, persistence, or pace; and (4) adapting or managing oneself will result in a finding that the impairment is not severe unless the evidence indicates that there is more than minimal limitation in the claimant's ability to do basic work activities. *Id.* §§ 404.1520a(d)(1), 416.920a(d)(1). Fourth, if the claimant's impairment is deemed severe, the ALJ compares the medical findings about the severe impairment and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment meets or is equal to a listed mental disorder. *Id.* §§ 404.1520a(d)(2), 416.920a(d)(2). Finally, if the ALJ finds that the claimant has a severe mental impairment, which neither meets nor equals a listed mental disorder, the ALJ assesses the claimant's residual mental functional capacity. *Id.* §§ 404.1520a(d)(3), 416.920a(d)(3). The regulations further specify how the findings and conclusion reached in applying the technique must be documented by the ALJ, stating:

> The decision must show the significant history, including examination and laboratory findings, the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each of the functional areas described in paragraph (c) of this section.

20 C.F.R. §§ 404.1520a(e)(4), 416.920a(e)(4).

Here, the ALJ determined as a preliminary matter that Claimant met the insured status for disability insurance benefits through December 31, 2018. (Tr. at 18, Finding No. 1). At the first step of the sequential evaluation, the ALJ confirmed that Claimant had not engaged in substantial gainful activity since August 22, 2015, the alleged disability onset date. (*Id.*, Finding No. 2). At the second step of the evaluation, the ALJ found that Claimant had the following severe impairments: "diabetes mellitus, degenerative disc

disease of the cervical and lumbar spine with L5-S1 disc bulge, and peripheral neuropathy in the bilateral feet." (Tr. at 18, Finding No. 3). The ALJ considered Claimant's hypertension, hyperlipidemia, vitamin D deficiency, hypothyroidism, dizziness, knots in her rib and stomach area, anxiety, depression, obsessive compulsive disorder, and trichotillomania, but found that the impairments were non-severe. (Tr. at 18-21). The ALJ further determined that Claimant's fibromyalgia, sleep apnea, and hearing or vision problems were not medically determinable impairments. (Tr. at 22).

Under the third inquiry, the ALJ concluded that Claimant did not have an impairment or combination of impairments that met or medically equaled any of the impairments contained in the Listing. (Tr. at 22-23, Finding No. 4). Accordingly, the ALJ determined that Claimant possessed:

> [T]he residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except she can: occasionally climb ramps and stairs; never climb ladders, ropes, or scaffolds; occasionally balance, stoop, kneel, crouch, and crawl; should avoid frequent exposure to extreme cold, extreme heat, dust, odors, fumes, gases, and other pulmonary irritants; and should avoid occasional exposure to vibration, unprotected heights, and moving mechanical parts.

(Tr. at 23-29, Finding No. 5).

At the fourth step, the ALJ determined, with the assistance of a vocational expert ("VE"), that Claimant could perform her past relevant work as a cashier. (Tr. at 29, Finding No. 6). In the alternative, the ALJ reviewed Claimant's past work experience, age, and education in combination with Claimant's RFC to determine her ability to engage in other substantial gainful activity. (Tr. at 30). The ALJ considered that (1) Claimant was born in 1964 and was defined as an individual closely approaching advanced age; (2) Claimant had at least a high school education and could communicate in English; and (3) transferability of job skills was not an issue because the Medical-Vocational Rules

supported a finding that Claimant was "not disabled," regardless of her transferable job skills. (*Id.*). Taking into account these factors, Claimant's RFC, and the testimony of a vocational expert ("VE"), the ALJ determined that Claimant could perform other jobs that existed in significant numbers in the national economy, including work as a routing clerk, press marker, and office helper. (Tr. at 30-31). Consequently, the ALJ concluded that Claimant was not disabled as defined by the Social Security Act and was not entitled to benefits. (Tr. at 31, Finding No. 7).

## IV.   Claimant's Challenges to the Commissioner's Decision

Claimant asserts numerous challenges to the Commissioner's decision. First, she contends that the ALJ erred in finding that her fibromyalgia was not a medically determinable impairment. (ECF No. 14 at 9-10). Second, Claimant argues that the ALJ did not develop the record regarding the opinions of the consultive examiners and Claimant's chiropractor. (*Id.* at 11-12). Third, Claimant asserts that the ALJ failed to consider her pain and perform any credibility determination, erroneously concluded that her activities of daily living were consistent with her ability to work, and neglected to consider the side effects of her medication. (*Id.* at 12-14). Fourth, Claimant asserts that the ALJ did not consider the combined effects of her diabetes mellitus, degenerative disc disease of the cervical and lumbar spine with L5-S1 disc bulge, and neuropathy in her feet. (*Id.* at 14-15). Fifth, Claimant argues that the ALJ "failed in his duty to produce evidence sufficient to rebut the presumption of disability." (*Id.* at 15).

In response to Claimant's arguments, the Commissioner asserts that the definition of disability under the Act and Regulations is stringent, and Claimant did not meet that burden. (ECF No. 19 at 9-10). Further, the Commissioner contends that the ALJ appropriately found that Claimant's fibromyalgia was not a medically determinable

impairment, the record was fully and fairly developed, Claimant's subjective complaints of pain were not entirely consistent with the evidence, and Claimant's alleged side effects were not supported by the evidence . (*Id.* at 10-13-20). In addition, the Commissioner argues that the ALJ considered Claimant's impairments in combination, and no presumption of disability exists. (*Id.* at 20-21).

## V.    **Relevant Evidence**

The undersigned has reviewed all of the evidence before the Court. The information that is most pertinent to Claimant's challenges is summarized as follows:

### A.  *Treatment Records*

Claimant presented to Diana Stotts, C-FNP, on September 23, 2015 concerning leg pain. (Tr. at 1023). Nurse Stotts diagnosed Claimant with a sensation disorder of undetermined physical or mental cause. (Tr. at 1025). Nurse Stotts ordered blood tests and a stress test to rule out a physical source of the pain, and she prescribed Buspar to determine if the issue was related to Claimant's anxiety. (*Id.*). Nurse Stotts recorded that Claimant's type 2 diabetes ("diabetes") was without complications. (*Id.*).

Claimant received treatment for back pain at Davis Chiropractic from March 10, 2016 to May 9, 2017. (Tr. at 857-98). During each physical examination, Roger J. Harris, D.C., (hereinafter Dr. Roger Harris) and Samantha J. Edens recorded that palpation revealed spasm, hypomobility and end point tenderness indicative of subluxation in the lumbosacral and thoracic spine; that Claimant exhibited hypertonicity in her thoracic and lumbosacral paraspinal muscles; and/or that Claimant felt pain during range of motion testing. (*Id.*).

On February 1, 2016, Claimant presented to her internist, Matthew D. Harris, M.D. (hereinafter Dr. Harris), regarding anemia and breast pain. Claimant's coordination was

within normal limits, but her sensory examination indicated numbness. (Tr. at 1000). Dr. Harris diagnosed Claimant with diabetic neuropathy and prescribed Cymbalta. (Tr. at 1001).

Shortly thereafter, Claimant followed up with Prasanna Santhanam, M.D., on April 25, 2016, regarding type 2 diabetes, a condition which she suffered from for the past 15 years. (Tr. at 822). Claimant complained of gastroparesis, but there was no evidence of neuropathy or retinopathy. (Tr. at 822, 825). Claimant was encouraged to lose weight and regularly exercise, and her medications were renewed. (Tr. at 825). During Claimant's next diabetic follow-up appointment on May 2, 2016, Dr. Harris again recorded that Claimant's coordination was normal, but her sensory examination indicated numbness. (Tr. at 995). Claimant stated that Cymbalta was helping her diabetic neuropathy "some." (*Id.*).

On September 13, 2016, Dr. Harris documented Claimant's normal neurological and psychiatric examinations, including normal cranial nerves, coordination, judgment, insight, orientation, memory, mood, and affect. (Tr. at 987). Dr. Harris refilled Claimant's prescription for Xanax to treat her anxiety and depression. (*Id.*).

On February 15, 2017, Claimant told Dr. Harris that she had bilateral leg weakness, and her legs were "giving out," causing her to fall several times. (Tr. at 977). She also reported tingling down both legs and aching. (*Id.*). On examination, Dr. Harris recorded that Claimant exhibited reduced range of motion and stiffness in her lower back, as well as numbness, but she had normal gait, station, and coordination of her body movements. (Tr. at 978). There were no abnormalities in Claimant's psychiatric examination. (*Id.*). Dr. Harris ordered a lumbar MRI. (Tr. at 979).

Claimant's lumbar MRI was performed on March 11, 2017, and it was compared to

her previous study on April 17, 2014. Claimant's vertebral body heights and alignment were maintained with no suspicious marrow signal abnormality. (Tr. at 848). She had minimal disc bulge at L2-3 with mild facet degeneration and no focal disc herniation or significant stenosis, which was stable from the prior study. (*Id.*). At L3-4, Claimant had a broad-based disc bulge and mild facet degeneration with ligament flavum hypertrophy. (*Id.*). The shallow central disc bulge and mild central canal stenosis were similar to the prior MRI, but Claimant had a left foraminal disc protrusion that was new and contributed to mild-to-moderate left neural foraminal stenosis. (*Id.*). A L4-5 Claimant had a mild disc bulge and mild facet degeneration, leading to flavum hypertrophy, and producing mild-to-moderate spinal canal stenosis and left neural foraminal stenosis, which was unchanged from her prior examination. (*Id.*). At L5-S1, Claimant had a disc protrusion and mild facet degeneration producing mild stenosis that was similar to the previous MRI. (Tr. at 848-49).

On March 17, 2017, Claimant presented to Dr. Harris regarding back pain, anxiety, depression, and peripheral neuropathy. (Tr. at 972). Like her previous examination, Claimant had reduced range of motion and stiffness in her lower back due to arthritis, and her neurological examination indicated numbness, but Claimant maintained normal gait, station, and coordination of body movements, as well as a normal psychiatric examination. (Tr. at 973). Dr. Harris noted that Claimant's recent MRI did not show any surgical problems. (Tr. at 974). Claimant's diabetes was stable on medications. (*Id.*). Dr. Harris increased Claimant's prescription for Neurontin for her diabetic neuropathy. (*Id.*).

Claimant presented to Teresa Twohig, C-FNP, on June 30, 2017 regarding a knot in her back and diabetes follow-up. (Tr. at 969). On examination, Claimant reported pain on palpation and stiffness in her right lower back, but Nurse Twohig did not feel a mass

or knot. (Tr. at 970). She diagnosed Claimant with muscular pain and prescribed baclofen. (Tr. at 971).

On October 10, 2017, Claimant followed up with Nurse Twohig regarding leg pain, cramps, and weakness. (Tr. at 1129). Claimant complained of tenderness on examination, but she had good muscle tone and strength. (Tr. at 1131). Her reflexes were equal and symmetric; her sensory examination was within normal limits; and her psychiatric examination did not indicate any abnormalities, including alert and fully oriented presentation, intact memory, and normal mood and affect. (*Id*.). For fatigue and leg cramps, Nurse Twohig ordered a comprehensive metabolic panel, increased Claimant's dosage of Neurontin, and advised her to drink more water. (*Id*.). Nurse Twohig also advised Claimant to watch her diet because high sugar would increase neuropathy. (Tr. at 1132).

Nurse Twohig recorded Claimant's normal gait, station, orientation, mood, and affect during Claimant's follow-up appointment on February 28, 2018. (Tr. at 1123). Claimant complained of "knots all over her," but Nurse Twohig did not feel any such knots on examination. (*Id*.). Nurse Twohig noted that Claimant had never been diagnosed with fibromyalgia, but she had some symptoms. (Tr. at 1124).

On March 14, 2018, Claimant presented to rheumatologist, William Dennison, M.D., at the referral of Dr. Harris. Claimant related a myriad of complaints, but she stated that her "regular doctors [did] not believe in fibromyalgia." (Tr. at 1104). Claimant's motor and sensory examinations were normal. (Tr. at 1106). Dr. Dennison diagnosed Claimant with osteoarthritis, generalized musculoskeletal discomfort, little knots in her skin of unknown cause, and severe generalized anxiety. (Tr. at 1106-07).

Claimant followed up with Nurse Twohig on May 21, 2018, reporting leg pain and

stiffness that made it difficult to get up after sitting. (Tr. at 1117). She said that "the rheumatologist" told her that the symptoms were caused by anxiety and fibromyalgia. (*Id*.). On examination, Claimant walked slow and expressed that it hurt when she arose from sitting. (Tr. at 1118). However, her musculoskeletal examination did not reveal any abnormalities, and her psychiatric examination was also normal. (*Id*.). Nurse Twohig prescribed medications and ordered x-rays. (Tr. at 1119). The x-rays of Claimant's hips and knees were taken on May 24, 2018, and they did not reveal any abnormalities. (Tr. at 1115, 1116).

On July 13, 2018, Claimant told Nurse Twohig that her chest bone was hurting. (Tr. at 1111). Her gait, station, joints, bones, and muscles were within normal limits. (Tr. at 1113). Nurse Twohig recorded that pain was not elicited when checking for fibromyalgia trigger points. (*Id*.). Claimant was oriented to person, place, and time; her mood, affect, and memory were normal; and she was noted to be a good historian, providing detailed information. (*Id*.). Claimant "felt that she was depressed." (Tr. at 1111). Thus, Nurse Twohig recommended duloxetine, but Claimant stated that she did "not want any brain juice." (Tr. at 1113). Nurse Twohig explained that the medication would help with depression and may also help with pain. (*Id*.). She encouraged Claimant to research the medication and let her know if she would like to try it. (*Id*.).

Claimant followed up with Dr. Harris on October 23, 2018. She complained of fatigue, knots in her side and back, muscle aches, and insomnia. (Tr. at 1164). Dr. Harris noted that there was no acute change in Claimant's physical conditions. (Tr. at 1168). Her gait and station were normal, and Dr. Harris' examination of Claimant's joints, bones, and muscles did not reveal any abnormalities. (Tr. at 1167). Claimant's neurological and psychiatric examinations were likewise normal. (Tr. at 1168). Dr. Harris ordered

laboratory tests and prescribed medications. (*Id.*).

On January 14, 2019, Claimant presented to neurosurgeon, Matthew Werthammer, M.D., regarding pain in her neck and right shoulder. Claimant denied any gait instability or incoordination. (Tr. at 1353). Dr. Werthammer noted that Claimant was "diabetic and also carrie[d] a diagnosis of fibromyalgia." (*Id.*). She had no edema in her extremities, tenderness to palpation, clubbing, or cyanosis. (*Id.*). She was awake, alert, and fully oriented with intact memory, fluent speech, and normal fund of knowledge. (*Id.*). She followed complex commands briskly. (*Id.*). Claimant's sensation was intact to joint position and pinprick throughout her body, there were no reflex abnormalities, and she had no swelling in her joints with normal range of motion. (*Id.*). There was also no evidence of paraspinal muscle spasm, point tenderness, or bony step-offs. (*Id.*). Claimant's motor strength was 5/5 in all extremities with normal muscle bulk and tone; her gait and posture were normal; and her straight leg raising, hip rotation, and Spurling's tests were negative bilaterally. (Tr. at 1354). Dr. Werthammer reviewed Claimant's cervical MRI, noting that Claimant had no significant stenosis, normal alignment, and no fracture. (*Id.*). He concluded that there was nothing to warrant surgical intervention, but he explained that pain management "would be an option down the road should the symptoms worsen despite exercises and therapy." (*Id.*). He diagnosed Claimant with cervical spondylosis. (*Id.*).

### B. Evaluations and Opinions

On June 19, 2017, psychologist, Angela Null, M.S., performed an Adult Mental Status Examination of Claimant. Claimant's appearance, attitude/behavior, orientation, thought processes and content, perception, judgment, insight, memory, persistence, and pace were normal. (Tr. at 905). Her mood was anxious, she was mildly fidgety, and she

displayed mildly deficient concentration and social functioning. (*Id*.). Claimant's typical activities included going to the grocery store and running errands three times per week; attending medical appointments, as scheduled; and spending less than an hour per day on housework. (Tr. at 906-07). She stated that she spent most of the day in bed alternating between using an ice pack and heating pad, her only hobby was watching television, and she had one close friend. (*Id*.). Claimant had a checking account and paid her bills and managed her finances independently. (Tr. at 906). Ms. Null diagnosed Claimant with generalized anxiety, somatic symptom, and panic disorders and trichotillomania. (*Id*.). She listed Claimant's prognosis as poor, but she stated that Claimant was capable of managing her finances should an award be made. (Tr. at 907).

On July 7, 2017, Kip Beard, M.D., performed an Internal Medicine Examination of Claimant. Her chief complaints were spine and joint pain. (Tr. at 1049). Her gait was mildly slow in pace and generally uncomfortable or stiff in posture without limp or ambulatory aid. (Tr. at 1052). She could rise from the chair and step up and down from the examination table without difficulty, and she could heel walk, toe walk, tandem walk, and stand on one leg with pain and difficulty. (*Id*.). She could fully squat and arise from squatting with pain, difficulty, and using the examination table for assistance. (*Id*.). She had no edema, clubbing, or cyanosis in her extremities. (Tr. at 1054). Her spinal range of motion testing caused pain and she had paraspinal muscle tenderness, but no spasm. (Tr. at 1055). She could raise her legs to 90 degrees in the seated and supine positions without radiculopathy symptoms. (*Id*.). She had pain and tenderness in her legs and feet and crepitus in her knees, but her sensory and manual muscle testing examinations were normal. (Tr. at 1057, 1060). Dr. Beard's impression was that Claimant suffered from cervicalgia, pain in the thoracic spine, low back pain, intervertebral disc displacement,

14

spondylosis, and primary osteoarthritis. (Tr. at 1062). He assessed that, based on the objective evidence in his report, Claimant's ability to perform work-related activities appeared impaired for activities such as prolonged weight bearing, squatting, climbing, bending, lifting, and carrying. (*Id.*).

On July 13, 2017, psychologist Holly Cloonan, Ph.D., performed a psychiatric review technique based upon her review of Claimant's records. Dr. Cloonan found that Claimant had mild limitations in understanding, remembering, and applying information; interacting with others; concentrating, persisting, or maintaining pace; and adapting or managing oneself. (Tr. at 437, 454). She concluded that Claimant's mental impairments were non-severe. (*Id.*).  This assessment was affirmed by James Binder, M.D., on September 25, 2017. (Tr. at 472, 488).

On July 21, 2017, Uma Reddy, M.D., assessed Claimant's physical RFC based upon her review of Claimant's records. She opined that Claimant could perform work at the light level of exertion with occasional postural activities, except for no climbing of ladders, ropes, or scaffolds due to history of vertigo. (Tr. at 439-40, 456-57). Further, Dr. Reddy assessed that Claimant could withstand no concentrated exposure to temperature extremes or fumes and even moderate exposure to vibration and hazards. (Tr. at 440, 457). This assessment was affirmed by Narendra Parikshak, M.D., on September 21, 2017. (Tr. at 476, 492).

Claimant's chiropractor, Dr. Roger Harris, provided an undated letter with a fax stamp of October 19, 2018, stating that Claimant was his patient, and she suffered from multiple osteoarthritic conditions within her spine, specifically her lumbar spine. (Tr. at 1145). In continuation, Dr. Roger Harris stated that any physical activity would acutely exacerbate Claimant's condition and he recommended that she discontinue any manual

or gainful employment at that time. (*Id.*).

### C. Claimant's Statements

Claimant testified during her administrative hearing on February 26, 2019. She claimed that every muscle and nerve in her body hurt. (Tr. at 48). She further testified that she had no energy, could not stand or sit, and spent her days lying in bed using ice and heat packs. (Tr. at 49). She testified that her doctors believed that the cause of her pain was peripheral neuropathy, chronic anxiety, and fibromyalgia. (*Id.*). Claimant estimated that she could sit for 30 minutes before her legs started becoming numb, and she could lift or carry five pounds. (Tr. at 51, 52). She noted that she had to change positions every couple of minutes when standing due to pain in her back and legs. (Tr. at 52). Claimant complained of "brain fog" and panic attacks. (Tr. at 53-54). She explained that she lived in a house with her daughter and grandchildren, who moved in two years earlier to help her pay utilities. (Tr. at 55, 66). Her daily activities included performing personal care, using her tablet computer for ten minutes at a time, attending doctors' appointments, eating, and napping. (Tr. at 56-57, 63). Claimant testified that her daughter did most of the chores, and Claimant did not socialize with people or maintain any hobbies. (Tr. at 57, 58). Claimant denied suffering any side effects from medication. (*Id.*). However, she later stated in response to her attorney's questioning that some of her medications, like Xanax, put her in "lala land." (Tr. at 62).

## VI.    <u>Standard of Review</u>

The issue before the Court is whether the final decision of the Commissioner is based upon an appropriate application of the law and is supported by substantial evidence. *See Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). In *Blalock v. Richardson*, the Fourth Circuit Court of Appeals defined "substantial evidence" to be:

16

> [E]vidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Blalock*, 483 F.2d at 776 (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). This Court is not charged with conducting a *de novo* review of the evidence. Instead, the Court's function is to scrutinize the record and determine whether it is adequate to support the conclusion of the Commissioner. *Hays*, 907 F.2d at 1456. When conducting this review, the Court does not re-weigh evidence, make credibility determinations, or substitute its judgment for that of the Commissioner. *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 2001) (citing *Hays*, 907 F.2d at 1456)). Moreover, "[t]he fact that the record as a whole might support an inconsistent conclusion is immaterial, for the language of § 205(g) ... requires that the court uphold the [Commissioner's] decision even should the court disagree with such decision as long as it is supported by 'substantial evidence.'" *Blalock*, 483 F.2d at 775 (citations omitted). Thus, the relevant question for the Court is "not whether the claimant is disabled, but whether the ALJ's finding of no disability is supported by substantial evidence." *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig*, 76 F.3d at 589).

### VII.  Discussion

Claimant challenges the ALJ's step two analysis of her fibromyalgia; development of the record; consideration of her pain, daily activities, and side effects of her medication; evaluation of her combination of impairments; and failure to rebut the "presumption of disability." Each argument is considered below, in turn.

#### A. Fibromyalgia

Claimant argues that the ALJ disregarded the opinions of her treating medical

providers and instead substituted his own opinion to conclude that her fibromyalgia was not a medically determinable impairment. She notes that several of her providers listed fibromyalgia as a diagnosed impairment, and she received treatment for the condition.

At the second step of the sequential evaluation, the ALJ determines whether a claimant has medically determinable impairments, and, if so, whether such impairments are severe within the meaning of the regulations. 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii), 404.1521, 416.921. A medically determinable impairment "must be established by objective medical evidence from an acceptable medical source," and the SSA "will not use [a claimant's] statement of symptoms, a diagnosis, or a medical opinion to establish the existence of an impairment(s)." *Id.* at §§ 404.1521, 416.921. As section DI 24501.020 of the SSA's Program Operations Manual System (POMS) explains, "[o]bjective medical evidence means signs, laboratory findings, or both." The term "signs" is defined as "one or more anatomical, physiological, or psychological abnormalities that are observable, apart from the claimant's statements (description of symptoms)," and the "[s]igns must be shown by medically acceptable clinical diagnostic techniques." POMS DI 24501.020. "Laboratory findings" are defined as "one or more anatomical, physiological, or psychological phenomena that can be shown by the use of medically acceptable laboratory diagnostic techniques." *Id.* Finally, "[d]iagnostic techniques include chemical tests (such as blood tests), electrophysiological studies (such as electrocardiograms and electroencephalograms), medical imaging (such as X-rays), and psychological tests." *Id.*

In this case, the ALJ noted Claimant's complaints of significant pain in her muscles and nerves, as well as "brain fog," for which she had taken medication to manage her symptoms. (Tr. at 22). However, the ALJ noted that neither Claimant's primary care provider, nor the neurosurgeon that examined her, found any trigger points. (*Id.*).

18

Therefore, the ALJ concluded that Claimant's fibromyalgia was not a medically determinable impairment. (*Id.*).

Claimant argues that by virtue of the fact that numerous providers listed fibromyalgia as an assessed condition and/or active problem, and she took medicine to treat the condition, that the ALJ erroneously substituted his lay opinion for those of her medical providers in concluding that her fibromyalgia was not medically determinable impairment. As an initial matter, the undersigned notes that Claimant relies, in part, on evidence that is not under consideration before the Court. (ECF No. 14 at 10). After the ALJ's decision was published, Claimant submitted additional medical records to the Appeals Council. The Appeals Council determined that some of the proffered records did not show a reasonable probability of changing the outcome of the decision, and the remainder of the records did not relate to the period at issue. Therefore, the records were not included as exhibits. (Tr. at 1-7). Thus, while the new evidence appears in the Transcript of the Administrative Proceedings, the Appeals Council did not incorporate it into the record. (Tr. at 6, 77-401). Claimant does not challenge the Appeals Council's decision not to incorporate the evidence. (ECF No. 14). Therefore, such an argument is waived. *Shinaberry v. Comm'r,* Soc. Sec. Admin., No. CV SAG-17-1376, 2018 WL 3973079, at *5 (D. Md. July 26, 2018), *aff'd sub nom. Shinaberry v. Saul,* 952 F.3d 113 (4th Cir. 2020); *Scheuvront v. Berryhill*, No. 3:17-CV-84, 2018 WL 3148230, at *7 n.4 (N.D.W. Va. Feb. 8, 2018).

"When the Appeals Council incorporates new evidence into the record, the Court must review the record as a whole including the new evidence." *Waters v. Astrue*, 495 F. Supp. 2d 512, 514 (D. Md. 2007). However, in this case, the new evidence, such as the March 2019 visit with Dr. Kumar, was not incorporated into the record. (Tr. at 291).

Therefore, the only issue before the undersigned is whether the ALJ's decision that Claimant's fibromyalgia was not a medically determinable impairment was supported by the evidence submitted for review by the ALJ.

On that note, while the record mentioned fibromyalgia as an assessed condition, there was a lack of objective evidence that Claimant suffered from the impairment. A claimant's subjective symptoms, or even a diagnosis, do not establish a medically determinable impairment. 20 C.F.R. §§ 404.1521, 416.921. The record must contain objective evidence of the condition. Here, Claimant's primary care provider, Nurse Twohig, recorded in February 2018 that Claimant had never been diagnosed with fibromyalgia, but she subjectively reported symptoms. (Tr. at 1124). In March 2018, Claimant saw rheumatologist, Dr. Dennison, who noted that Claimant had not undergone any specific laboratory studies or other test to rule out other causes of her generalized pain. (Tr. at 1104). Dr. Dennison did not record any findings regarding fibromyalgia, and did not diagnose Claimant with fibromyalgia. (Tr. at 1104-09). Nevertheless, Claimant told Nurse Twohig at her next appointment in May 2018 that the rheumatologist told her that her leg pain was due to fibromyalgia and anxiety. (Tr. at 1117). In July 2018, Nurse Twohig stated that pain was not elicited when she examined Claimant for fibromyalgia trigger points. (Tr. at 1113). Dr. Werthammer likewise found no evidence of point tenderness when he examined Claimant in 2019. (Tr. at 1353). Her sensation and reflexes remained intact; she had no joint swelling or muscle spasm; and she had normal posture, gait, range of motion, and muscle strength and tone. (Tr. at 1353-54). In addition, as to Claimant's reported fibromyalgia "brain fog," Claimant was awake and alert, and she followed Dr. Werthammer's commands briskly with intact memory, fluent speech, and normal fund of knowledge. (Tr. at 1353). Therefore, while fibromyalgia appeared in

Claimant's records as an assessed condition based on her subjective symptoms, there was no indication of an objective diagnosis.

Therefore, the undersigned **FINDS** that more than a scintilla of evidence supports the ALJ's assessment that Claimant's fibromyalgia was not a medically determinable impairment. *Stephens v. Saul*, No. 3:20-CV-00046, 2020 WL 5665813, at *15 (S.D.W. Va. Sept. 4, 2020), *report and recommendation adopted,* 2020 WL 5665070 (S.D.W. Va. Sept. 23, 2020) (finding that substantial evidence supported the ALJ's step two determination that the claimant's hip pain diagnosis was not based on clinical findings, and it was thus not a medically determinable impairment).

### B. *Duty to Develop the Record*

Claimant next argues that the ALJ failed to develop the record regarding the opinions of the consultative examiners, Dr. Beard and Ms. Null, and Claimant's chiropractor, Dr. Roger Harris. (ECF No. 14 at 11-12). An ALJ's duty is to ensure that the record contains sufficient evidence upon which the ALJ can make an informed decision. *Ingram v. Commissioner of Social Security Administration,* 496 F.3d 1253, 1269 (11th Cir. 2007); *Weise v. Astrue,* No. 1:08-cv-00271, 2009 WL 3248086 (S.D.W. Va. Sept. 30, 2009); *Jones v. Saul*, No. 1:19-cv-275-GCM, 2020 WL 2411635, at *3 (W.D.N.C. May 12, 2020). Consequently, when examining the record to determine if it was adequate to support a reasoned administrative decision, the Court looks for evidentiary gaps that resulted in "unfairness or clear prejudice" to Claimant.  *Marsh v. Harris,* 632 F.2d 296, 300 (4th Cir. 1980).

#### 1.  Dr. Beard

With respect to Dr. Beard, Claimant first argues that the ALJ should have developed the record concerning Dr. Beard's consultative examination report because Dr.

Beard concluded that Claimant's ability to perform physical work-related activities appeared impaired for activities such as prolonged weight bearing, squatting, climbing, bending, lifting, and carrying, yet "Dr. Beard's report [...] lacked any clarity on her impairments, specifically to what extent she [wa]s impaired." (ECF No. 14 at 11). The ALJ considered Dr. Beard's foregoing opinion and concluded that it was persuasive, noting that Dr. Beard's mild examination findings were consistent with the objective x-rays and MRIs in the record. (Tr. at 28). However, the ALJ noted that Dr. Beard failed to define the parameters of the limitations. (*Id.*). The ALJ discussed in detail his consideration of Claimant's clinical treatment, objective tests, daily activities, and the RFC opinions of Dr. Reddy and Dr. Parikshak. (Tr. at 24-29). The ALJ concluded that the state agency physicians' RFC opinions that Claimant could perform a range of light work were supportable, balanced, objective, and consistent with the evidence as a whole, including Claimant's mild MRI findings and her improvement from conservative treatment such as exercises, chiropractic care, and physical therapy. (Tr. at 29).

Based on the above, there were no inadequacies or gaps in the record that the ALJ was obligated to develop with respect to Dr. Beard's opinion. The Transcript of the Administrative Proceedings contained the records of Claimant's clinical treatment; an internal medicine examination; opinions from non-examining medical sources; as well as Claimant's adult function reports, pain questionnaires, and testimony during Claimant's administrative hearing. Although Dr. Beard did not quantify the amount of weight that Claimant could lift or carry or the frequency with which Claimant could climb, bend, or squat, two state agency physicians reviewed Dr. Beard's examination findings and Claimant's other medical records, and they concluded that Claimant could perform work at the light exertional level with occasional postural activities, except for no climbing of

ladders, ropes, or scaffolds. Notably, these assessments were consistent with Dr. Beard's opinion that Claimant's ability to perform work-related activities appeared impaired for activities such as such as prolonged weight bearing, squatting, climbing, bending, lifting, and carrying. The ALJ gave the state agency RFC assessments significant weight. Therefore, the record contained adequate information for the ALJ to evaluate Claimant's ability to lift, carry, squat, climb, and bend. There was no additional information that the ALJ needed from Dr. Beard in order to perform the function-by-function analysis and make an informed decision on Claimant's disability applications.

### 2. Ms. Null

Claimant also contends that the ALJ should have developed the record concerning Ms. Null's mental consultative examination report. Ms. Null documented normal mental examination findings with the exception of Claimant's anxious mood, mildly fidgety behavior, and mildly deficient concentration and social functioning. (Tr. at 905). She noted that Claimant's prognosis was poor, but that Claimant appeared capable of managing her finances should an award be made. (Tr. at 907). Claimant argues that the ALJ should have requested from Ms. Null information as to why Claimant's prognosis was poor. (ECF No. 14 at 12).

Claimant again fails to identify any inadequacies or gaps in the record that precluded the ALJ from making an informed decision or resulted in unfair prejudice to Claimant. The ALJ examined the record in detail concerning Claimant's alleged mental impairments, including Claimant's subjective symptoms; treatment, including a prescription for Xanax; consultative examination findings; statements to her primary care provider; other mental status examination findings; daily activities; and paragraph B criteria. (Tr. at 19-21). The ALJ noted that Claimant refused referrals for psychiatric

23

care; never required hospitalization for mental health issues; declined medication from Nurse Twohig; and had normal mood, good memory, and was noted to be a detailed historian. (Tr. at 27-28). The ALJ also considered the assessments of psychologists, Dr. Cloonan and Dr. Binder, finding that they were consistent with Claimant's lack of specialized mental health treatment, statements that she could get along with others, and normal mood and affect on many mental status examinations. (Tr. at 29).

Based on the above, there was no evidentiary gap regarding Claimant's mental health prognosis. As such, there was no additional information that the ALJ required from Ms. Null in order to evaluate her report, perform the function-by-function analysis, or make an informed decision on Claimant's disability applications.

### 3. Dr. Roger Harris

Finally, Claimant contends that the ALJ should have developed the record regarding the opinion of Claimant's chiropractor, Dr. Roger Harris. (ECF No. 14 at 12). Dr. Roger Harris provided an undated letter with fax stamp of October 19, 2018 in which he stated that Claimant was his patient, and she suffered from multiple osteoarthritic conditions within her spine, specifically her lumbar spine. (Tr. at 1145). He opined that any physical activity would acutely exacerbate her condition, and he recommended that she discontinue any manual or gainful employment at that time. (*Id.*).

The ALJ considered Dr. Roger Harris' letter, but he did not find it valuable or persuasive. (Tr. at 28). The record contained Dr. Roger Harris' treatment records, which detailed Claimant's subjective complaints and Dr. Roger Harris' objective findings and treatment plan. (Tr. at 857-98). In addition, as mentioned above, the Transcript of the Administrative Proceedings included Claimant's other clinical records, objective tests, consultative examinations, and opinion evidence. There was ample evidence for the ALJ

to evaluate Dr. Roger Harris' opinion.

Based on all of the above, the undersigned **FINDS** that the record was sufficient for the ALJ to make an informed decision and that there were not inadequacies or evidentiary gaps in the record for which the ALJ was obligated to develop the evidence.

### C.  Pain, Credibility, and Side Effects

In her third assertion of error, Claimant contends that the ALJ failed to properly consider her pain; erred in finding that her activities were inconsistent with her allegations of disability; and failed to discuss, much less consider, the side effects of her medication on her ability to work. (ECF No. 14 at 12-14).

Under the applicable Social Security rulings and regulations, an ALJ is obliged to use a two-step process when evaluating the credibility of a claimant's subjective statements regarding the effects of his or her symptoms. 20 C.F.R. §§ 404.1529, 416.929 (effective March 27, 2017). First, the ALJ must consider whether the claimant's medically determinable medical and psychological conditions could reasonably be expected to produce the claimant's symptoms, including pain. *Id*. §§ 404.1529(a), 416.929(a). In other words, "an individual's statements of symptoms alone are not enough to establish the existence of a physical or mental impairment or disability." Social Security Ruling ("SSR") 16-3p, 2016 WL 1119029, at *2 (effective March 16, 2016). Instead, evidence of objective "[m]edical signs and laboratory findings, established by medically acceptable clinical or laboratory diagnostic techniques" must be present in the record and must demonstrate "the existence of a medical impairment(s) which results from anatomical, physiological, or psychological abnormalities and which could reasonably be expected to produce the pain or other symptoms alleged." 20 C.F.R. §§ 404.1529(b), 416.929(b).

Second, after establishing that the claimant's conditions could be expected to

produce the alleged symptoms, the ALJ must evaluate the intensity, persistence, and severity of the symptoms to determine the extent to which they prevent the claimant from performing basic work activities. *Id.* §§ 404.1529(a), 416.929(a). If the intensity, persistence, or severity of the symptoms cannot be established by objective medical evidence, the ALJ must consider "other evidence in the record in reaching a conclusion about the intensity, persistence, and limiting effects of an individual's symptoms," including a claimant's own statements. SSR 16-3p, 2016 WL 1119029, at *5-*6. In evaluating a claimant's statements regarding his or her symptoms, the ALJ must consider "all of the relevant evidence," including: the claimant's history; objective medical findings obtained from medically acceptable clinical and laboratory diagnostic techniques; statements from the claimant, treating sources, and non-treating sources; and any other evidence relevant to the claimant's symptoms, such as, evidence of the claimant's daily activities, specific descriptions of symptoms (location, duration, frequency and intensity), precipitating and aggravating factors, medication or medical treatment and resulting side effects received to alleviate symptoms, and other factors relating to functional limitations and restrictions due to the claimant's symptoms. 20 C.F.R. §§ 404.1529(c)(1)-(3), 416.929(c)(1)-(3); *see also Craig*, 76 F.3d at 595; SSR 16-3p, 2016 WL 1119029, at *4-*7.

SSR 16-3p provides further instruction on what type of evidence should be considered when the intensity, persistence, or severity of the symptoms cannot be established by objective medical evidence. SSR 16-3p, 2016 WL 1119029, at *6. The ruling presents an extensive list of evidence that may prove probative and notes that valuable evidence to consider may include (1) a longitudinal record of any treatment and its success or failure, including any side effects of medication and (2) indications of other impairments, such as potential mental impairments, that could account for an

individual's allegations. *Id.*

> In *Hines v. Barnhart*, the Fourth Circuit stated that:

> Although a claimant's allegations about her pain may not be discredited solely because they are not substantiated by objective evidence of the pain itself or its severity, they need not be accepted to the extent they are inconsistent with the available evidence, including objective evidence of the underlying impairment, and the extent to which that impairment can reasonably be expected to cause the pain the claimant alleges she suffers.

453 F.3d at 565 n.3 (citing *Craig*, 76 F.3d at 595). The ALJ may not reject a claimant's allegations of intensity and persistence solely because the available objective medical evidence does not substantiate the allegations; however, the lack of objective medical evidence may be one factor considered by the ALJ. SSR 16-3p, 2016 WL 1119029, at *5.

Ultimately, "it is not sufficient for [an ALJ] to make a single, conclusory statement that 'the individual's statements about his or her symptoms have been considered' or that 'the statements about the individual's symptoms are (or are not) supported or consistent.' It is also not enough for [an ALJ] simply to recite the factors described in the regulations for evaluating symptoms. The determination or decision must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the [ALJ] evaluated the individual's symptoms." *Id.* at *9. SSR 16-3p instructs that "[t]he focus of the evaluation of an individual's symptoms should not be to determine whether he or she is a truthful person;" rather, the core of an ALJ's inquiry is "whether the evidence establishes a medically determinable impairment that could reasonably be expected to produce the individual's symptoms and given the adjudicator's evaluation of the individual's symptoms, whether the intensity and persistence of the symptoms limit the individual's ability to perform work-related activities." *Id.* at *10.

When considering whether an ALJ's evaluation of a claimant's reported symptoms is supported by substantial evidence, the Court does not replace its own assessment for those of the ALJ; rather, the Court scrutinizes the evidence to determine if it is sufficient to support the ALJ's conclusions. In reviewing the record for substantial evidence, the Court does not re-weigh conflicting evidence, reach independent determinations as to the weight to be afforded to a claimant's report of symptoms, or substitute its own judgment for that of the Commissioner. *Hays*, 907 F.2d at 1456. Because the ALJ had the "opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight." *Shively v. Heckler*, 739 F.2d 987, 989 (4th Cir. 1984).

In this case, the ALJ clearly performed the two-step process. The ALJ considered Claimant's allegations that uncontrolled diabetes caused numbness, burning, and tingling in her lower extremities, which caused her to fall, and she also suffered headaches, dizziness, and confusion when her blood glucose was uncontrolled. (Tr. at 24). The ALJ also reviewed Claimant's allegations of cervical and lumbar pain for which she stated that nothing totally relieved her symptoms, and the ALJ considered Claimant's alleged functional limitations. (*Id.*). Ultimately, after considering the evidence, the ALJ concluded that Claimant's medically determinable impairments could reasonably be expected to cause her alleged symptoms. (Tr. at 24-27).

However, the ALJ found that Claimant's statements concerning the intensity, persistence, and limiting effects of these symptoms were "not entirely consistent with the medical evidence and other evidence in the record" for several reasons. The ALJ noted that, despite Claimant's reported back pain and functional limitations, recent testing revealed mild findings and physical examinations did not document any strength deficits,

28

circulatory compromise, neurological deficits, muscle spasms, fasciculations, fibrillations, or muscle atrophy or dystrophy, which are often associated with long-standing severe or intense pain and physical inactivity. (Tr. at 27). In addition, the ALJ noted that, despite Claimant's statements that her multiple conditions limited her ability to function, she reported that she performed personal hygiene and simple chores, lived with her daughter and two young grandchildren without any difficulty getting along with them, used the internet, and watched television. (*Id*.). The ALJ cited that Claimant also stated in November 2016 that her back pain worsened recently because she was caring for her mother, who had dementia and recently underwent hip surgery. (*Id*.).

Claimant's challenge regarding side effects of medication, in particular, is curious given the fact that the ALJ questioned Claimant during her administrative hearing whether she had any side effects from her medications, and Claimant responded, "[n]ot that I've noticed. Not the ones I'm taking now." (Tr. at 58). Later, Claimant's attorney posed a leading question, asking Claimant if the side effects of her medications such as Xanax were "kind of drowsiness and inability to focus." (Tr. at 62). Claimant responded, "[y]es [...] "[b]oth of them will kind of like put in lala land." (*Id*.).

In any event, the ALJ clearly considered Claimant's prescription for Xanax, reported brain fog, and trouble focusing related to her various conditions. (Tr. at 19-22). While the ALJ might not have explicitly mentioned those complaints in the context of medication side effects, the Claimant does not point to any critical evidence, which the ALJ neglected to consider, that had any conceivable impact on the ALJ's decision.

As shown above, the ALJ properly considered Claimant's statements, her daily activities, and the medical evidence to evaluate the intensity, persistence, and severity of Claimant's reported symptoms. (Tr. at 24-29). Claimant offers nothing to rebut the ALJ's

well-reasoned conclusions and specific citations to the record. Therefore, the undersigned **FINDS** that substantial evidence supports the ALJ's subjective symptom analysis.

### D. Combination of Impairments

Claimant contends that the ALJ did not consider the combination of her impairments. (ECF No. 14 at 14). She states that her back pain, along with peripheral neuropathy from her diabetes, causes numbness, pain, and falling. (*Id.* at 15). An ALJ must consider the combined, synergistic effect of all of a claimant's medically determinable impairments, severe and non-severe, to accurately evaluate the extent of their resulting limitations on the claimant. *Walker v. Bowen,* 889 F.2d 47 (4th Cir. 1989). The relevant regulations provide:

> In determining whether your physical or mental impairment or impairments are of a sufficient medical severity that such impairment or impairments could be the basis of eligibility under the law, we will consider the combined effect of all of your impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity.

20 C.F.R. §§ 404.1523, 416.923. Where there is a combination of impairments, the issue "is not only the existence of the problems, but also the degree of their severity, and whether, together, they impaired the claimant's ability to engage in substantial gainful activity." *Oppenheim v. Finch*, 495 F.2d 396, 398 (4th Cir. 1974). The ailments should not be fractionalized and considered in isolation but considered in combination to determine the impact on the ability of the claimant to engage in substantial gainful activity. *Id.* The cumulative or synergistic effect that the various impairments have on claimant's ability to work must be analyzed. *DeLoatche v. Heckler*, 715 F.2d 148, 150 (4th Cir. 1983). As the United States Court of Appeals for the Fourth Circuit stated in *Walker,* "[i]t is axiomatic that disability may result from a number of impairments which, taken

30

separately, might not be disabling, but whose total effect, taken together, is to render claimant unable to engage in substantial gainful activity." *Walker,* 889 F.2d at 50.

Here, the ALJ very thoroughly considered Claimant's back pain and diabetic neuropathy. The ALJ discussed, in detail, Claimant's allegations, the objective evidence, and the opinions offered in this matter. (Tr. at 24-29). The decision clearly articulates the ALJ's well-supported rationale for finding that Claimant's impairments, alone or in combination, did not preclude her from engaging in substantial gainful activity. (*Id.*). To the extent that the ALJ did not elaborate further on the analysis of Claimant's impairments in combination, the undersigned finds further elaboration to be unnecessary, because the required analysis clearly took place. Therefore, the undersigned **FINDS** that the ALJ complied with his duty under the applicable law to consider Claimant's impairments in combination.

### E.  *Presumption of Disability*

In her final challenge to the Commissioner's decision, Claimant contends that the ALJ failed to produce evidence sufficient to rebut the presumption of disability. Claimant indicates that the evidence was "overwhelming" in her favor, and the ALJ failed to rebut it. (ECF No. 14 at 15). However, there is no "presumption of disability" under the Social Security Act, as Claimant suggests. A claimant is ultimately responsible for proving that he or she is disabled, and that responsibility never shifts to the Commissioner. If Claimant is suggesting that the ALJ failed to demonstrate, at the fifth step of the sequential evaluation process, that Claimant was capable of performing jobs which existed in significant numbers in the economy, that suggestion is without merit. The ALJ explicitly found that Claimant was capable of performing her past relevant work as a cashier. Consequently, Claimant did not establish a *prima facie* case of disability. Regardless, the

ALJ went beyond that finding and further determined, with the help of a vocational expert, that other jobs were available in significant numbers in the national economy that Claimant could perform despite her vocational factors and history; including, work as a routing clerk, press marker, and office helper. To the extent that Claimant argues that the Court should independently reevaluate Claimant's case, and reach different conclusions than the ALJ, the undersigned **FINDS** that such contention is without any legal basis.

## VIII.  Recommendations for Disposition

Based on the foregoing, the undersigned United States Magistrate Judge respectfully **PROPOSES** that the presiding District Judge confirm and accept the findings herein and **RECOMMENDS** that the District Judge **DENY** Plaintiff's request for judgment on the pleadings, (ECF Nos. 14); **GRANT** the Commissioner's request for judgment on the pleadings, (ECF No. 19); **AFFIRM** the decision of the Commissioner; **DISMISS** this action, with prejudice, and remove it from the docket of the Court.

The parties are notified that this "Proposed Findings and Recommendations" is hereby **FILED**, and a copy will be submitted to the Honorable Robert C. Chambers, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and three days (if received by mail) from the date of filing this "Proposed Findings and Recommendations" within which to file with the Clerk of this Court, specific written objections, identifying the portions of the "Proposed Findings and Recommendations" to which objection is made, and the basis of such objection. Extension of this time period may be granted by the presiding District Judge for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de*

*novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. *Thomas v. Arn*, 474 U.S. 140 (1985); *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984). Copies of such objections shall be provided to the opposing party, Judge Chambers, and Magistrate Judge Eifert.

The Clerk is directed to file this "Proposed Findings and Recommendations" and to provide a copy of the same to counsel of record.

**FILED**:  December 1, 2020

Cheryl A. Eifert
United States Magistrate Judge